Filed 07/21/25

VERMONT SUPERIOR COURT
Washington Unit
65 State Street
Montpelier VT  05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 25-CV-02215

| DAIL v. Inn-One Home, LLC, d/b/a Our House Residential Care Homes et al |
| --- |

## FINDINGS, CONCLUSIONS, AND ORDER

Plaintiff is the Vermont Department for Disabilities, Aging and Independent Living (DAIL). Defendant Inn-One Home, LLC, which does business as Our House Residential Care Homes (the Our House LLC), owns and operates three long-term care facilities in the Rutland area: defendants Our House Residential Care Home (the Our House Home), Our House Too Residential Care Home (the Our House Too Home), and Our House Outback (the Outback Home). DAIL filed this case on May 23, 2025, seeking to place the defendant facilities in a receivership pursuant to 33 V.S.A § 7202(a).

A hearing on DAIL's application was held over three days on June 9, June 16, and June 30.[1] The court heard testimony from DAIL employees Carolyn Scott, Jenielle Shea, and Pamela Cota; two former juvenile employees of defendants. R.T. and A.W.; defendants' owner Paula Patorti; and a former court-appointed receiver for defendants, Mark Stickney. For the reasons set forth below, DAIL's application for a receivership is granted.

### Findings of Fact

The following facts are found by clear and convincing evidence based on the credible evidence admitted at the three-day hearing. *See Comm'r of DAIL v. Homestead at Pillsbury*, No. 618-11-18 Wncv, 2019 WL 13061512, at *18 (Jan. 25, 2019) (Teachout, J.) (applying clear-and-convincing standard and noting support for notion that "the extraordinary nature of the appointment of a receiver counsels in favor" of applying a heightened standard (citing 65 Am.Jur.2d Receivers § 67)).

The principals of the Our House LLC are Paula and Pasquale Patorti. The LLC holds a separate license from DAIL to operate each of the three defendant facilities as a Level III Residential Care Home. Level III homes are group living arrangements that provide "assistance with meals, dressing, movement, bathing, grooming, or other personal needs, or general

---

[1] The merits hearing was initially scheduled for June 2, 2025, but was continued after defendants moved to disqualify the assigned judge. The hearing resumed on June 9 after the motion to disqualify was denied by the Chief Superior Judge. *See* Entry Regarding Motion (June 6, 2025) (Zonay, J.). Plaintiff has waived the requirement in 33 V.S.A. § 7204(a)(1) that the hearing be held within 10 days of the complaint being filed.

supervision of physical or mental well-being, including nursing overview and medication management as defined by the licensing agency by rule, but not full-time nursing care." 33 V.S.A. §7102(10)(A). The Our House home has ten beds, the Our House Too Home has thirteen beds, and the Outback Home has twelve beds. The Our House LLC previously operated a fourth Level III Residential Care Home—Our House at Park Terrace (the Park Terrace Home)—which closed in late 2024. At the time of its closure, the Park Terrace Home had eight residents. Each Our House home is or was separately licensed by DAIL.

Level III homes are subject to DAIL's Residential Care Home Rules (RCH Rules).[2] DAIL has also approved each of the three currently operating Our House facilities to operate as a special care unit focusing on memory care, which subjects the facilities to additional regulatory requirements. *See generally* RCH Rules § 5.6. The Park Terrace Home was not approved as a special care unit. The Our House LLC was the licensee for each home, and Ms. Patorti was listed on each license as the "manager," *i.e.*, the point of contact for DAIL and the person "in charge of the daily management and business affairs of the home, fully authorized and empowered to carry out the provisions of these rules, and charged with the responsibility of doing so." *See* RCH Rules § 4.13b. Ms. Patorti oversees the general operations of each facility, and the defendants' employees often work at multiple facilities.

DAIL conducts announced and unannounced on-site "surveys" of licensed homes to ensure compliance with its regulations as part of the relicensing process and in response to specific complaints received. If violations are found during these surveys, DAIL will conduct an exit interview with the licensee's manager and then provide a written survey report or deficiency statement to the licensee. These reports are prepared by the staff who conduct the on-site survey and are then reviewed and approved by DAIL's State Long Term Care Manager, who during the period relevant to this case, was Carolyn Scott. If an identified deficiency is at the "immediate jeopardy" level—meaning the deficiency "is likely to cause serious injury, serious harm, serious impairment, or death to a resident"—then DAIL will promptly return to the facility to ensure that the violation has been removed. *See* RCH Rules § 2.2.[3] Upon receipt of a deficiency statement, the home must provide DAIL with a corrective action plan. If DAIL approves the plan, no further action is taken. If DAIL rejects the plan, it requires the home to submit a new plan. If multiple plans from the home are rejected, DAIL may unilaterally direct that specific corrective actions be taken.

The Our House homes have a significant regulatory history with DAIL. The four Our House facilities (Our House, Our House Too, Outback, and Park Terrace) were placed in a receivership in June 2021 by stipulation of the parties. Mark Stickney was appointed as a

---

[2] The RCH Rules were amended effective April 2025. The court will refer to the current rules except where a discrepancy exists between the current rules and those in effect during the events in question.

[3] The specific "immediate jeopardy" definition was added to the RCH Rules in April 2025, but DAIL apparently used the term prior thereto.

receiver and managed the facilities until the receivership was terminated, with the parties' consent, in October 2022.

The current proceeding focuses on what happened next, in particular, alleged regulatory violations documented by DAIL in various survey reports issued in 2024 and 2025. *See generally* Plaintiff's Exhs. 3-8.[4] DAIL's major areas of concern are summarized below.

### 1. Closure of the Park Terrace Home

In November 2024, Ms. Patorti informed DAIL that the Park Terrace Home would be emergently closing because of a staffing shortage. The Park Terrace Home had eight residents at the time. DAIL worked with Ms. Patorti to ensure these residents were relocated to the other three remaining Our House facilities within approximately one week of Ms. Patorti's notification. Defendants treated these relocations as "transfers" and not as new admissions at the other facilities. DAIL disagrees with this characterization, and concluded the relocations amounted to an involuntary discharge from Park Terrace followed by a new admission to another Our House home. *See* RCH Rules §§ 2.2, 5.3 ("An involuntary discharge of a resident is the removal of the resident from a home when the resident or the resident's legal representative has not requested or consented in advance to the removal. A transfer is the removal of the resident from the room the resident currently occupies to another room in the home or to another facility with an anticipated return to the home."). By treating the relocations as transfers and not new admissions, DAIL accordingly concluded that defendants failed to comply with the relevant notice requirements for involuntary discharges, which are intended to provide the residents with procedural rights to contest and have input regarding their relocation, and with the paperwork required for new admissions, which is intended to ensure patient safety, continuity of care, and appropriate funding. *See* RCH Rules §§ 5.2, 5.3.

The emergent closure was concerning to DAIL and required a sufficient expenditure of agency resources. DAIL terminated Park Terrace's license in early December 2024.

### 2. The Our House Home

On October 28, 2024, DAIL conducted an unannounced site visit at the Our House Home as part of an annual relicensing survey. It is not clear from the record who conducted this survey. DAIL substantiated regulatory deficiencies related to medication management, inadequate staff training, failure to maintain progress notes for residents, failure to maintain written policies and procedures, and failure to maintain the laminate flooring in the facility. DAIL approved defendants' corrective action plan in December 2024. *See generally* Pls. Exh. 8.

---

[4] The court previously ruled that these exhibits were admissible to prove that plaintiff conducted surveys of defendants' facilities on the dates reflected in the reports, that plaintiff found violations on those dates, and that plaintiff reported those violations to defendants. The reports themselves, however, are not proof that the underlying violations occurred. Order on Admissibility of Plaintiff's Exhibits (June 10, 2025). To the extent the court finds that violations occurred, those findings are based on the witness testimony and other evidence presented.

### 3. The Our House Too Home

On December 16, 2024, DAIL conducted an unannounced site visit at the Our House Too Home as part of an annual relicensing survey. The visit was completed the following day. DAIL's nurse surveyor Jenielle Shea participated in the survey. DAIL substantiated regulatory deficiencies including those related to the failure to complete admission paperwork for residents relocated from Park Terrace, medication management, failure to maintain progress notes for residents, and failure to maintain written care plans for residents. DAIL approved defendants' corrective action plan in February 2025. *See generally* Pls. Exh. 5.

On April 24, 2025, two juvenile staff members at Our House Too observed the on-site facility manager Dexter Agasi verbally and physically abuse a resident. The resident, who often exhibited difficult behaviors, was refusing to allow staff to file her nails, which was part of her routine hygiene care. Mr. Agasi directed the staff members to continue trying to file the resident's nails. When the resident continued to refuse, Mr. Agasi became angry, told the resident to "shut the fuck up," threw a chair, and took the nail file. He then used his hand to exert pressure on the resident's neck and back and brought the resident into her bedroom and closed the door. After the resident began screaming "No" and "Help" and crying uncontrollably, the two staff members each made a recording on their phone to document the situation. Although it was not unusual for this resident to cry or became emotional, her screams during this incident were much louder and more intense, concerning to the staff members, and disruptive to the other residents. After about five minutes or so, the staff members entered the bedroom and saw the resident red-faced and crying and Mr. Agasi very close to her. He did not appear to be attempting to file her nails, as the nail file was not in his hand.

The two staff members met with Ms. Patorti and reported the incident at the end of their shift on April 24. Ms. Patorti told the staff members that she would review the footage from incident and told them not to discuss the incident with other employees. Ms. Patorti also expressed confidence in Mr. Agasai and stated that he knew how to calm the resident using "pressure points." After waiting several days and not having observed any actions being taken by Ms. Patorti, the staff members reported their concerns to other adults. Both staff members quit their jobs at Our House soon thereafter.[5]

In response to a complaint received about the April 24 incident, DAIL made an unannounced site visit to the Our House Too Home on May 7, 2025. Ms. Scott personally participated in this visit. Mr. Agasi was present and working and had access to the residents when DAIL arrived. Mr. Agasi admitted that he was upset on April 24 for personal reasons, that he sometimes uses a pressure or grabbing technique to soothe residents, and that on April 24 he

---

[5] Criminal charges have since been filed against Mr. Agasi based on this incident. *See* No. 25-CR-5940. At the hearing, Ms. Patorti, on advice of counsel, invoked her privilege against self-incrimination and refused to answer questions about the incident. DAIL requested the court draw an adverse inference against Ms. Patorti based on her refusal. The court declines to do so. The factual findings recited above are based on the other evidence presented related to the April 24 incident.

had been rougher than usual. Ms. Scott also me with Ms. Patorti, who acknowledged the incident and confirmed that she did not report it to DAIL or law enforcement because she did not believe it rose to the level of abuse. DAIL substantiated multiple regulatory violations, including for staff-to-resident abuse, failure to report abuse, failure to respect residents' right to refuse care, failure to perform background checks on staff, and inadequate training. DAIL concluded Mr. Agasi's continued presence at the Our House Too Home was an immediate jeopardy violation. Mr. Agasi's employment was terminated following the May 7 site visit, which removed the immediate jeopardy. DAIL approved defendants' corrective action plan for the other deficiencies in June 2025, after these proceedings began.

### 4. The Outback Home

On June 7, 2024, DAIL conducted an unannounced site visit in response to a complaint received regarding the Outback Home. Nurse Surveyor Jenielle Shea participated in the visit.

Pursuant to the Outback Home's approval as a special care unit, it was required to always have at least two staff members on site. Some of the Outback Home's residents also require physical assistance from one or more staff members. DAIL's June 7 investigation revealed that the Outback Home typically only had one staff member present overnight, and that one of the two staff members present during the June 7 survey had significant mobility limitations (requiring use of a walker), making it difficult if not impossible for that individual to provide the physical assistance that at least some of the home's residents required. DAIL determined that the inadequate staffing at the Outback Home was an "immediate jeopardy" violation.

DAIL's concerns were reported to Ms. Patorti following the June 2024 visit. Ms. Shea and another state employee returned to the Outback Home on August 21, 2024, for an unannounced follow-up visit and observed only one staff member present at that time. Another staff member apparently had been at the Outback Home before the DAIL team arrived that day but had left to assist with staffing coverage at another facility.[6] Ms. Shea was at the Outback Home for over an hour before a second staff member arrived. Based on the August 21 survey, DAIL continued the immediate jeopardy violation. DAIL approved defendants' corrective action plan in October 2024.

On March 11, 2025, DAIL conducted an unannounced site visit at the Outback Home as part of an annual relicensing survey and in response to an anonymous complaint. The visit was completed on March 17. Ms. Shea participated in the visit. DAIL substantiated regulatory deficiencies including those related to housing residents whose needs exceeded what the home could safely provide, failing to maintain adequate care plans, failing to maintain progress notes, inadequate staffing, failing to complete background checks for staff, failing to maintain written policies, and failing to provide timely meals to residents.

Additionally, DAIL concluded, and the record supports, that the Outback Home was failing to provide appropriate incontinence care to high-needs residents that required toileting every two hours or so. These residents were regularly "double-briefed" overnight in lieu of being

---

[6] DAIL had also sent a separate investigative team to the Park Terrace Home on August 21.

provided more regular toileting, residents were observed having soiled themselves, and at least one resident was observed with impaired skin in the diaper area.

The parties dispute whether this skin impairment issue was being treated at the time of the visit. DAIL also took issue with the home's bathrooms being locked, which prevented the residents from using the bathroom unassisted. Defendants maintain this was done for safety reasons.

In an April 4 letter to defendants, DAIL suspended all new admissions to the Outback Home. At the time of the hearing, the parties had not agreed on a corrective action plan in response the March 2025 violations, some of which defendants contest.

## Conclusions of Law

By statute, DAIL regulates long-term residential care homes to "promote safe surroundings, adequate care, and humane treatment; safeguard the health of, safety of, and continuity of care to residents; and protect residents from the adverse health effects caused by abrupt or unsuitable transfer of such persons cared for in these facilities." 33 V.S.A. §§ 504, 7101. DAIL is authorized to seek appointment of a receiver for a long-term residential care home in furtherance of these interests. 33 V.S.A. §§ 7201-7217. The laws pertaining to DAIL and its programs must be "construed liberally" to carry out the Legislature's policies in this area, including to ensure that older Vermonters are able "to live as independently as they choose and as their personal circumstances permit" and are "protected against unlawful and unnecessary restriction." 33 V.S.A. § 501; *see also Bacigalupo v. Bacigalupo*, 2022 VT 43, ¶ 19, 217 Vt. 143 (noting that courts should "liberally construe" ambiguities in remedial statutes "to suppress the evil and advance the remedy intended by the Legislature" (discussing Abuse Prevention Act (quotation omitted)).

DAIL may file a complaint in superior court requesting the appointment of a receiver when:

(1) a licensee intends to close and has not secured suitable placements for its residents at least 30 days prior to closure;

(2) a situation; a physical condition; or a practice, method, or operation that presents imminent danger of death or serious physical or mental harm to residents exists in a facility, including imminent or actual abandonment of a facility;

(3) a facility is in substantial or habitual violation of the standards of health, safety, or resident care established under State rules or federal regulations to the detriment of the welfare of the residents or clients;

(4) the facility is insolvent; or

(5) the licensing agency has suspended, revoked, or modified the existing license of the facility.

33 V.S.A. § 7202(a). Following a hearing on the merits of DAIL's application under this section, the court may appoint a receiver if it finds—based on the condition of the facilities at the time the complaint was filed—that one or more of the grounds set forth above is satisfied.

Here, DAIL seeks appointment of a receiver under Section 7202(a)(2) and (a)(3).

With respect to Section 7202(a)(2), the complaint cites the November 2024 closure of the Park Terrace Home and the April 2025 incident of physical and verbal abuse of a resident at the Our House Too Home, and defendants' conduct in the wake of that incident. While these incidents are highly concerning, the court cannot conclude that—as of May 23, 2025, when the complaint was filed—that they presented an "imminent danger of death or serious physical or mental harm to residents."

Defendants worked closely with DAIL in connection with the closure of the Park Terrace Home to ensure that the home's residents were successfully relocated to defendants' other facilities months before this case was filed. As further discussed below, the emergent closure of the Park Terrace Home and the subsequent admission of the home's residents at other facilities ran afoul of the RCH Rules in several respects and the abrupt relocation was detrimental to the residents' welfare as a general matter. The evidence does not show, however, that the closure and relocations posed an imminent danger of death or serious harm to any resident at the time that DAIL's complaint was filed.

The April 2024 incident involving Mr. Agasi at the Our House Too Home is highly troubling. The evidence shows that Mr. Agasi verbally and physically abused a resident, that defendants were immediately informed of the abuse, and that defendants not only failed to report the abuse to DAIL or law enforcement but allowed Mr. Agasi to continue working at the home for nearly two weeks with access to the residents. Nonetheless, the record shows that the April 24 abuse appears to have been an isolated incident, and that by at least May 8, the incident had been reported to DAIL and that Mr. Agasi's employment had been terminated. The court accordingly cannot conclude that this situation posed an imminent danger of death or serious harm to any resident on May 23 when the complaint was filed.

With respect to 7202(a)(3), DAIL's argument for appointment of a receiver is more compelling. Since the end of the last receivership in October 2022, the evidence admitted at the hearing establishes the following regulatory violations that were detrimental to the welfare of defendants' residents:

- Failing to ensure adequate staffing at the Outback Home in June and August 2024 to safely provide for the residents' mobility needs. *See* RCH Rules § 5.11.a; 33 V.S.A. §§ 501, 7101, 7201;

- Closing the Park Terrace Home on an emergency basis in November 2024 and providing significantly less than 30 days' notice before relocating the home's residents to other facilities and thereby forcing the residents to abruptly change their living situation and limiting the residents' procedural rights and ability to

have a meaningful voice with respect to their relocations. *See* RCH §§ 5.3a(2), 6.14; 33 V.S.A. §§ 501, 7101, 7201.[7]

- Neglecting residents' individualized toileting needs and failing to ensure adequate incontinence care at the Outback Home in March 2025, which was detrimental to the residents' health and dignity. *See* RCH Rules §§ 5.11.a, 6.1, 6.12, 33 V.S.A. §§ 501, 7101, 7201.

- Mr. Agasi's verbal and physical abuse of a resident at the Outback Too Home on April 24, 2025, and defendants' failure to promptly report that abuse or ensure that Mr. Agasi's access to residents was suspended or terminated pending investigation. *See* RCH Rules §§ 5.11.b, 5.12.c(5), 6.1, 6.12, 6.15, 33 V.S.A. §§ 501, 7101, 7201.

The court concludes that these violations were proved by clear and convincing evidence at the merits hearing, and that collectively, they establish that defendants' facilities are "in substantial or habitual violation" of the RCH Rules "to the detriment of the welfare of the residents" at defendants' homes. *See* 33 V.S.A. § 7202(a)(3).[8]

Having concluded that appointment of a receiver is warranted, the clerk shall schedule a one-hour hearing to consider proposed candidates. At least three days in advance of the hearing, the parties shall submit a final list of the names, qualifications, and requested compensation for any proposed candidates the parties want the court to consider, in order of preference. No more than three candidates should be submitted by each side.[9]

---

[7] DAIL's position that these relocations were "discharges" and not "transfers" is supported by the unambiguous language of the RCH Rules. A "discharge" under the rules "means movement of a resident out of the home without expectation that the resident will return," whereas a "transfer" means "movement of movement of a resident to another bed within the home or to another health care setting with return to the home anticipated." RCH Rules § 2.2, 5.3.a(1) (same). When the Park Terrace Home residents were relocated, there was no expectation that they would return given the home's imminent closure.

[8] Because the court concludes the regulatory violations described above suffice to grant DAIL's application for a receiver, the court does not consider whether the numerous other violations documented by DAIL separately satisfy Section 7202(a)(3).

[9] At the merits hearing, the parties disputed whether the court could consider a receiver candidate proposed by defendants. Although the statutory framework requires only DAIL, as the licensing agency, to submit a list of names, and anticipates the court will choose a name from that list, the relevant statutory language does not preclude the court's consideration of other candidates. *See* 33 V.S.A. § 7206(a) (" . . . the court *may* appoint a receiver from the list provide by the licensing agency . . ." (emphasis added)).

## Order

DAIL's application for appointment of a receiver is GRANTED.

The clerk shall schedule a one-hour hearing to consider proposed candidates for the receivership.

At least three days in advance of the hearing, the parties shall submit a final list of the names, qualifications, and requested compensation for any proposed candidates the parties want the court to consider, in order of preference. No more than three candidates should be submitted by each side.

Electronically signed on: 7/21/2025 pursuant to V.R.E.F. 9(d)

_____

Benjamin D. Battles
Superior Court Judge